UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BETTY MANNING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:13-CV-00007 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Betty Manning appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion.

**I. PROCEDURAL HISTORY**

Manning applied for SSI in August 2009; although she alleged disability back to October 15, 1994, the earliest she could receive SSI was September 2009. (Tr. 132-37, 158); *see* 20 C.F.R. § 416.335 ("[T]he earliest month for which we can pay you [SSI] benefits is the month following the month you filed the application."). The Commissioner denied her application initially and upon reconsideration. (Tr. 52-53.) A hearing was held on May 9, 2011, before Administrative Law Judge ("ALJ") Yvonne Stam, at which Manning (who was represented by

---

[1] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

counsel) and a vocational expert ("VE") testified. (Tr. 29-51.) On July 5, 2011, the ALJ rendered an unfavorable decision to Manning, concluding that she was not disabled because she could perform a significant number of unskilled, light work jobs in the economy. (Tr. 10-22.) After the Appeals Council denied her request for review, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-6.)

Manning filed a complaint with this Court on January 9, 2013, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Manning alleges that the ALJ erred by: (1) failing to consider her treating chiropractor's records, which contradicted the ALJ's findings in part; and (2) assigning a residual functional capacity ("RFC") that failed to adequately accommodate her mental limitations. (Social Security Opening Br. of Pl. ("Opening Br.") 6-13.)

## II.  FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Manning was forty-eight years old and had obtained her GED and attended at least one year of college. (Tr. 132, 173, 419.) She had past work experience as a bartender, waitress, driver, and telemarketer, but had not worked since 1994. (Tr. 159, 242.) Manning alleges disability due to a number of medical conditions, including fibromyalgia, cardio pulmonary obstructive disease ("COPD"), depression, irritable bowel syndrome, acid reflux, depression, and anxiety. (Tr. 33, 158.)

At the hearing, Manning testified that she lives with a male friend and her seventeen-year-old son. (Tr. 32-33.) She performs her own self care and some household chores, including

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 498-page administrative record necessary to the decision.

cooking, laundry, and light cleaning. (Tr. 39-42.) She drives a car and goes to the grocery by herself once every week or two. (Tr. 40.) She testified that if she does too much in one day, the next two days she will have to stay in bed; she has approximately ten bad days a month where she lies in bed all day. (Tr. 41.) Mornings are the most difficult time of the day for her, and thus, she does not start doing anything around the house until early afternoon. (Tr. 33, 44-45.)

When asked why she thought she could not work, Manning listed chronic pain, fatigue, poor sleep, deficits in concentration and memory, depression, stress and anxiety, difficulty being around other people, and that she easily feels frustrated and overwhelmed. (Tr. 33.) She stated that she is never without pain, explaining that it ranges from "four" to "eight" on a ten-point scale. (Tr. 46-47.) Manning estimated that she could sit for thirty minutes, stand for twenty minutes, walk for twenty minutes when leaning on a cart, and lift a gallon of milk with two hands. (Tr. 37-39.) It takes her approximately twelve hours to get seven hours of sleep because her sleep "is all broken up" due to pain. (Tr. 33.) She states she wakes up "feeling bad" in that she is "stiff and sore," nauseated, and "in a fog" and cannot concentrate; thus, she just lies in bed with a heating pad. (Tr. 33.) She also complained of nausea as a medication side effect. (Tr. 44.)

Manning stated that she lost her Medicaid benefits after she inherited some money in 2008; when the money ran out, she could no longer afford medical treatment. (Tr. 34-35.) Recently, however, she was approved for health benefits under the Healthy Indiana Plan. (Tr. 35.)

### B. Summary of the Relevant Medical Evidence

Manning logged more than fifty visits to Dr. Warren, a chiropractor, from July 2006 to March 2009, for complaints of pain, fibromyalgia, and scoliosis. (Tr. 264-356.) Manning

3

complained of significant pain at each of her visits, and Dr. Warren regularly documented painful, limited spinal range of motion; spinal tenderness; inflamed soft tissues; and hypertonic muscles. (Tr. 266-356.)  Dr. Warren treated her with adjustments, manual therapy, traction, and heat. (Tr. 266-356.)

At her initial evaluation with Dr. Warren in July 2006, Manning reported that she was "almost always" in pain, which worsened in the morning and after activity. (Tr. 266.)  She complained that it interfered with her ability to work, sleep, and participate in recreation, and that sitting, standing, walking, bending, and lying down were all painful. (Tr. 266.)  A heating pad, hot shower, massage, and rest helped alleviate her symptoms. (Tr. 312.)  A neurological and muscular exam was normal, but an orthopedic exam revealed positive "Kemps" and "Yeoman's" spinal tests; painful and moderately restricted cervical and lumbar range of motion; and some trigger points and areas of inflammation. (Tr. 269-70.)  Dr. Warren's clinical impression was that Manning had cervical and thoracic spine pain, lumbar facet syndrome, and sacroiliac syndrome. (Tr. 270.)  Spinal x-rays in July 2006 revealed postural changes of the cervical spine, mild disc degeneration at C4-5, abnormal alignment of the thoracic and lumbar vertabra, mild spondylosis in the mid to upper thoracic spine, and early spondylosis at L1-2 and L3-4 levels. (Tr. 271-72.)

In September 2006, Dr. Warren reevaluated Manning, documenting results similar to the July examination; a straight leg raise and "Fabere-Patrick's" tests were positive. (Tr. 294.)  Three months later, in December 2006, Dr. Warren's evaluation showed similar range of motion deficits and pain, as well as positive findings on five spinal tests. (Tr. 309-11.)  Manning reiterated the complaints she made six months earlier—that her pain was constant and interfered with all of her activities; she also reported numbness and weakness of her legs. (Tr. 312.)

In January 2008, Manning visited Ralph Inabnit, D.O., her treating doctor, and discussed her claim for disability; he provided a check-up and medication review, and assessed fibromyalgia and COPD. (Tr. 381.)  Dr. Inabnit commented that Manning was "trying hard" to get disability benefits, but "can't quite make the grade on it." (Tr. 381.)  In May 2008, Dr. Inabnit wrote that Manning had arthralgias and myalgias, but no active synovitis, effusion, or erythema of the joints. (Tr. 379-80.)  He stated that he "support[ed] her disability." (Tr. 380.)

In June 2008, Dr. Warren reevaluated Manning and found painful cervical and lumbar range of motion; however, this time she had primarily mild restrictions in cervical motion and some normal lumbar motion. (Tr. 315-16.)  Manning again had positive responses to five spinal tests, including the straight leg raise. (Tr. 315.)  Dr. Warren noted that Manning complained of frequent headaches. (Tr. 315.)  One month later, Dr. Warren reported that Manning's spinal range of motion was still painful but with primarily mild restrictions. (Tr. 331.)  Manning tested positive to two spinal tests. (Tr. 331.)

In July 2008, Manning returned to Dr. Inabnit, who observed that she was "in good health without complaints or problems." (Tr. 376.)  He wrote that her chronic medical problems, including a "long standing history of fibromyalgia," had been stable. (Tr. 376.)  In a review of systems, Dr. Inabnit noted arthralgias, myalgias, and diffuse joint aches and pains, but no malaise or weakness. (Tr. 376.)  He assessed fibromyalgia and hyperlipidemia, and encouraged smoking cessation. (Tr. 377.)  In August, however, Dr. Inabnit noted no arthritis, joint stiffness, swelling, or myalgias. (Tr. 374.)  But in October, Dr. Inabnit again documented arthralgias and myalgias. (Tr. 371.)  In December, Dr. Inhabit wrote that although Manning had some arthralgias and myalgias, she was otherwise asymptomatic, commenting that she "feels good and looks

good." (Tr. 368-69.)

In March 2009, Manning complained to Dr. Warren that her legs jerked at night. (Tr. 342.) Upon reevaluation, Manning had pain and moderate restrictions in cervical range of motion, but primarily mild restrictions or normal range of motion in her lumbar spine; the "Kemps" and straight leg raise tests, however, were positive. (Tr. 343.) A neurological and muscular exam was normal. (Tr. 343.) In December 2009, Dr. Inabnit identified Manning's diagnoses as depression, fibromyalgia, hyperlipidemia, anxiety, fatigue, bronchial spasms, and gastroesophageal reflux disease. (Tr. 359.)

In February 2010, Manning underwent a mental health examination by Patrick Utz, Ph.D., reporting that she felt depressed and anxious. (Tr. 419-23.) She told Dr. Utz that she had been trying to get disability benefits for the last twelve years and that Dr. Inabnit was "assisting [her]" with the process. (Tr. 419.) Dr. Utz noted that Manning was "abrasive and somewhat argumentative," seemingly upset because he made her "work" by answering questions during the session. (Tr. 420.) He observed that she excelled at providing diagnoses for herself, but was less able to describe her symptoms. (Tr. 420.) She stated that her physical problems were most severe, but that she also had severe depression and anxiety secondary to her physical problems. (Tr. 420.) She also said that she experiences panic attacks, but had difficulty describing the severity of the attacks. (Tr. 420.) Her memory was intact, and she was purposeful in her presentation of information, although rather evasive. (Tr. 421.) Dr. Utz thought that Manning attempted to persuade him of her various medical conditions, "rather than present an accurate psychological description of herself." (Tr. 422.) He diagnosed her with depressive disorder, not otherwise specified (mild to moderate); adjustment reaction with mixed emotional features; and

also noted some narcissistic patterns. (Tr. 422.)  Dr. Utz assigned her a Global Assessment of Functioning ("GAF") score of 57.[3] (Tr. 422.)

In April 2010, Manning underwent a consultative physical examination by Dr. Gina Moore Dudley. (Tr. 424-29.)  Manning had mild tenderness in four of eighteen fibromyalgia trigger points, which was non-diagnostic for fibromyalgia. (Tr. 427.)  A clinical exam, including range of motion, strength, and gait testing, was normal, except lumbar forward flexion was 80 out of 90 degrees; a straight leg raise test was negative bilaterally. (Tr. 425-27.)  Dr. Dudley concluded that Manning did not have any significant functional limitations, opining that she could stand or walk (without an assistive device) at least six hours in an eight-hour workday, lift and carry twenty-five pounds frequently and fifty pounds occasionally, and perform unlimited sitting. (Tr. 427.)

In May 2010, Dr. M. Brill, a state agency physician, reviewed Manning's record and concluded that her physical impairments were not severe. (Tr. 430.)  Another state agency physician later affirmed Dr. Brill's opinion. (Tr. 445.)  That same month, Kenneth Neville, Ph.D., reviewed Manning's record and concluded that her mental impairments were not severe. (Tr. 431-44.)  A second state agency psychologist later affirmed Dr. Neville's opinion. (Tr. 446.)

In August 2010, Manning returned to Dr. Inabnit, complaining of depression that had started one year earlier. (Tr. 449.)  But he noted that her depression had improved. (Tr. 449.)  A musculoskeletal exam was negative for bone/joint symptoms and weakness. (Tr. 450.)  She

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

requested a letter from Dr. Inabnit stating that she could not work so that she could have her Medicaid benefits reinstated. (Tr. 449.) She was given medication refills and samples, and continued receiving refills and samples thereafter. (Tr. 452-75.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV.  ANALYSIS

#### A.  *The Law*

Under the Act, a plaintiff is entitled to SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . .

8

. has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Manning is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. The ALJ's Decision

On July 5, 2011, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 10-22.) She found at step one of the five-step analysis that Manning had not engaged in substantial gainful activity after her application date, and at step two, that Manning's

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

COPD and depression were severe impairments. (Tr. 12.)  At step three, however, the ALJ concluded that Manning's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 14-15.)

Before proceeding to step four, the ALJ determined that Manning's symptom testimony was not credible to the extent it portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform unskilled, light work . . . , except no temperature extremes, no concentrated exposure to pulmonary irritants[], no work with the general public, and no fast paced work activity.

(Tr. 16.)  Manning had no relevant past work to consider at step four. (Tr. 20.)  Based on the assigned RFC and the VE's testimony, the ALJ concluded at step five that Manning could perform a significant number of unskilled, light occupations in the economy, including inspector/hand packager, bagger of garments, and photocopy machine operator. (Tr. 21.)  Accordingly, Manning's claim for SSI was denied. (Tr. 22.)

### C.  The ALJ Ignored Medical Evidence That Undermined Her Conclusion

First, Manning asserts that the ALJ improperly ignored the records of her treating chiropractor, Dr. Warren, that were contrary to the ALJ's conclusion.  Manning's argument has some merit.

The opinion of a chiropractor is not an "acceptable medical source" under the Social Security regulations, but rather is considered an "other source." *See Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1055 (E.D. Wis. 2005); 20 C.F.R. 416.913(d); SSR 06-03p, 2006 WL 2329939, at *2.  Although information from an "other source" cannot establish the existence of a medically determinable impairment, it may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL

2329939, at *2; see *Masch*, 406 F. Supp. 2d at 1055 (stating that opinions from "other sources" must not be ignored).

Moreover, the ALJ must consider all relevant evidence and may not analyze only that information that supports her final conclusion. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (citing *Clifford*, 227 F.3d at 871). That is, an ALJ must not ignore evidence which contradicts her opinion, but must evaluate the record fairly. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Here, as explained earlier, Dr. Warren treated Manning more than fifty times from July 2006 to March 2009. Yet, the only reference the ALJ made to Dr. Warren's records was when discussing the imaging and test results of record, she commented that the spinal x-rays were taken in September 2006 "during a period of chiropractic care." (Tr. 17.)

But Dr. Warren's records contradict, at least to some extent, some of the ALJ's findings. Specifically, the ALJ concluded that the "treatment records since November 2007 show that examinations have been largely unremarkable" (Tr. 17); that "objective findings have been minimal or benign" (Tr. 19); and that "[t]he record as a whole fails to establish significant ongoing symptoms" (Tr. 19). But Manning consistently complained to Dr. Warren of significant pain at each of her chiropractic visits, asserting that various postural movements exacerbated her pain. (Tr. 266-356.) And Dr. Warren regularly assessed reduced, painful spinal range of motion; spinal tenderness; inflamed soft tissues; hypertonic muscles; and trigger points. (Tr. 266-356.) Manning also testified positive for up to five objective spinal tests during Dr. Warren's evaluations, including the straight leg raise test. (Tr. 269-70, 294, 309-11, 315, 331, 343.)

These findings serve, at least to some extent, to bolster Manning's credibility about her

pain, *see, e.g.*, *Mulvaney v. Barnhart*, No. 05 C 4439, 2006 WL 2252547, at *18 (N.D. Ill. Aug 3, 2006), and undermine the physical RFC assigned by the ALJ. For example, the ALJ assigned Manning an RFC for light work, which requires occasional stooping. *See* SSR 83-10, 1983 WL 31251, at *5-6. But Dr. Warren's records consistently reflect that Manning's spinal range of motion was limited to some extent and painful, which could impact her ability to perform light work. *See Golembiewski*, 322 F.3d at 917 (remanding where, among other things, the ALJ failed to discuss the evidence considering claimant's limited ability to bend his back, which could impact his ability to perform light work). And although Dr. Dudley's one-time examination recorded a negative straight leg raise test and only a ten degree limitation in lumbar flexion, Dr. Warren's records from 2006 to 2009 often reveal positive straight leg raise tests and moderate restrictions in spinal range of motion. (*Compare* Tr. 426-27, *with* Tr. 269, 294, 310, 315, 343.)

The Commissioner argues, however, that the ALJ did not error by failing to discuss Dr. Warren's records since they pre-date Manning's August 2009 SSI application date and did not specifically assign Manning functional limitations. As such, the Commissioner contends, they have limited relevance to the time period at issue. *See* 20 C.F.R. § 416.335 (stating that SSI is not payable prior to the month following the month in which the application was filed).

But the Commissioner's own regulations explain that it will "develop [a claimant's] complete medical history for at least the 12 months preceding the month" in which a claimant's application is filed. 20 C.F.R. § 416.912(d). Similarly, the Commissioner's rulings state that when assessing a claimant's credibility, "the medical evidence, *especially a longitudinal medical record*, can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *6 (emphasis added). And the

ALJ did, in fact, consider and discuss other medical evidence from this same time period (Tr. 13, 15-20), which undercuts the Commissioner's argument.

Therefore, the Commissioner's final decision will be remanded so that the ALJ can consider Dr. Warren's records in accordance with SSR 06-03p and 20 C.F.R. § 416.913 and explain any weight she assigns to such records.

### D. *The RFC Fails to Adequately Accommodate Manning's Moderate Social Restrictions*

Manning also contends that the ALJ failed to adequately account in the mental RFC and step-five hypothetical for her findings at steps two and three that she had moderate deficiencies in social functioning. Indeed, the RFC and the hypothetical do not withstand scrutiny in this regard.

At steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4. Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3); *see Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." SSR 96-8p, 1996 WL 374184, at *4; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011). To reiterate, the "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL

374184, at *2; *see* 20 C.F.R. § 416.945(a)(1).  "The RFC assessment must be based on *all* of the relevant evidence in the case record." SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original); *see* 20 C.F.R. § 416.945(a)(3).  In that regard, cases from the Seventh Circuit Court of Appeals "generally have required the ALJ to orient the VE to the totality of a claimant's limitations." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).  The "cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *Id.*

Here, when assessing the "paragraph B" criteria at steps two and three, the ALJ concluded that Manning had "moderate" restrictions in social functioning. (Tr. 14-15.)  But rather than include these "moderate" restrictions directly in the hypothetical to the VE as the Seventh Circuit suggests, the ALJ instead assigned Manning a mental RFC that prevented her from "work with the general public." (Tr. 16.)

As Manning points out, this limitation does not address the social difficulties she would likely encounter with co-workers and supervisors.  Indeed, "[a]s the Commissioner has explained before, even a moderate limitation on responding appropriately to supervisors may undermine seriously a claimant's ability to work." *O'Connor-Spinner*, 627 F.3d at 621 (citing 20 C.F.R. § 404.1545(c); SSR 85-15); *see* 20 C.F.R. § 416.945(c) ("A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and *in responding appropriately to supervision, co-workers*, and work pressures in a work setting, may reduce your ability to do past work and other work." (emphasis added)); *see, e.g.*, *Bradley v. Astrue*, No. 11-cv-3, 2012 WL 4361410, at *13-15 (N.D. Ill. Sept. 21, 2012) (determining error was not harmless where ALJ failed to explain how claimant's moderate

deficits in social functioning impacted his ability to perform simple, unskilled tasks); *Real v. Astrue*, No. 11 C 4205, 2012 WL 6642390, at *11 (N.D. Ill. Dec. 18, 2012) (remanding where neither the RFC nor the hypothetical accounted for claimant's potential for angry, rude behavior in the workplace).

Of course, the Seventh Circuit has clarified that when a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating a hypothetical question for the VE. *See Milliken v. Astrue*, 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (concluding that the ALJ's limitation to low-stress, repetitive work adequately incorporated the claimant's moderate mental limitations because the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could still perform low-stress, repetitive work"). This, however, is *not* a case where the ALJ relied upon a medical source's translation of Manning's moderate deficits in social functioning into a specific RFC finding. In fact, the ALJ flatly rejected Dr. Neville's opinion that Manning had "mild," rather than "moderate," restrictions in social functioning. (Tr. 20.)

Furthermore, the ALJ mischaracterized the record in one respect when assessing Manning's social functioning. The ALJ, citing Manning's adult function report, stated that Manning "reported having company on occasion, and . . . denied difficulty getting along with family, friends, or acquaintances." (Tr. 15.) But Manning stated just the opposite in that report—she wrote that she *did* have problems getting along with family, friends, and neighbors, commenting that she does not have the patience to deal with people and generally avoids being around them. (Tr. 212.)

In sum, because the ALJ failed to adequately accommodate Manning's moderate deficits in social functioning in the RFC and in her questioning of the VE at step five, the ALJ's step five conclusion will be remanded.[5]

### V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings.  The Clerk is directed to enter a judgment in favor of Manning and against the Commissioner.

SO ORDERED.

Enter for this 20th day of November, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[5] Because a remand is warranted concerning Manning's moderate social deficits, the Court need not reach her argument that the ALJ's limitation in the RFC to "no fast paced work activity" failed to adequately accommodate her moderate limitations in concentration, persistence, or pace.  But the Court notes that courts in the Seventh Circuit have often distinguished *O'Connor-Spinner* in that respect and found the RFC and hypothetical adequate where the ALJ accounted for limitations in concentration, persistence, or pace by imposing restrictions similar to that assigned by the ALJ here.  *See Zoephel v. Astrue*, No. 12-C-726, 2013 WL 412608, at *11 (E.D. Wis. Feb. 1, 2013) (collecting cases).